# New Orleans, Mobile & Chattanooga Railroad Company *v.* Dunn *et al.*

*Bill in Equity to enjoin Municipal Corporation from issuing Bonds in Aid of Railroad Company.*

1. *Who may file bill.* — A bill in chancery against a municipal corporation, to prevent a threatened usurpation of power by the corporate authorities, or the violation of a duty imposed by law, whereby the burden of taxation will be increased, may be filed by property-holders or tax-payers, without the intervention of the attorney general, or other officer representing the State.

2. *Municipal corporation; power to issue bonds in aid of railroad.* — The charter of the city of Mobile confers no express power on the corporate authorities to issue the bonds of the city in aid of a railroad corporation, to enable it to purchase cer-

tain swamp lands within the city, either as a gratuity, or in consideration of the location by the railroad company of its machine shops and workshops on the said lands; nor is such power necessarily implied in the grant of general police powers, or in any of the special powers expressly conferred; nor can the issue of such bonds be supported by any considerations of supposed benefit to the city, or to the health of its inhabitants, arising from the reclamation, drainage, and improvement of the lands.

3. *Same; power to issue negotiable bonds.* — A municipal corporation cannot, without a grant of express power, issue negotiable bonds.

APPEAL from the Chancery Court of Mobile.

Heard before the Hon. ADAM C. FELDER.

The bill in this case was filed on the 4th November, 1869, by William D. Dunn and others, citizens and tax-payers in the city of Mobile, in behalf of themselves and such other citizens and tax-payers as might choose to come in and contribute to the expenses of the suit, against the corporation of the city of Mobile, its mayor and clerk officially, and the New Orleans, Mobile, and Chattanooga Railroad Company. Its object was to enjoin and prevent the issue of certain bonds, which the said corporate authorities of Mobile were preparing to issue in aid of said railroad company, under an ordinance passed for that purpose, a copy of which was made an exhibit to the bill, and which was as follows: —

" AN ORDINANCE to aid in the improvement of the city of Mobile. *Whereas*, it is manifestly to the interest of the city of Mobile that the New Orleans, Mobile, and Chattanooga Railroad Company should locate its machine and workshops in the city of Mobile, instead of some other point on the line of its railroad; *and whereas*, it has been found by careful investigation that the grounds selected and most eligible for the purposes of said company will exceed a probable cost of three hundred thousand dollars, besides a large additional expense in improvements and structures upon said property; *and whereas*, the requirements of the company for lands, for depot purposes, freight and passengers, are of such a character for central location, and the cost of the same largely aggravated on account of improvements which are of no value whatever to the company; *and whereas*, it is the intention of the company to immediately commence improving the lands to be acquired in accordance with this ordinance, in such a manner as will ornament that portion of the city, expending several hundreds of thousands of dollars in our midst, and among our own citizens: Therefore — Section 1. *Be it ordained,*" &c., " That the mayor and the clerk of Mobile shall issue, under the corporate seal of the city of Mobile, three hundred bonds, of one thousand dollars each, payable to —— or bearer, thirty years after the date thereof, bearing interest at the rate of eight per centum *per annum*, payable semi-annually, at the Merchants' National Bank in the city of New York; that to each of said bonds

shall be attached interest coupons, payable on the first day of May and November in each and every year, at said bank. Sec. 2. *Be it further ordained,* That all of said-bonds shall be appropriated for the uses and benefit of, and to aid said company in the purchase of the grounds, lands, and premises, to erect thereon machine-shops and workshops, and other purposes of said company, situated and located in the city of Mobile, and described as follows : Bounded by Charleston street on the north, by the channel of the Mobile river on the east, by the southern boundary line of the south division of the Bernoudy Tract on the south, and on the west by Conception street, running north to Texas or Elmira street; and from either of these streets may continue its western boundary to Charleston street on the north, by either Conception or St. Emanuel street. Sec. 3. *Be it further ordained,* That for the location of the depot for freight or passengers, or both, the said railroad company are hereby authorized to locate the same on the piece or parcel of land in the city of Mobile, bounded on the north by Church street, on the south by Madison street, on the west by Water street, and on the east by the Mobile river; or the piece or parcel of land in the city of Mobile, bounded on the north by Theatre street, on the south by the lands described in section two of this ordinance, on the west by Royal street, and on the east by the Mobile river; or a line parallel to either of the foregoing boundary lines, as may be deemed most practicable by the said company. And · all the right, title, and interest of the city of Mobile, in and to the streets and lands and premises within said aforenamed and situated boundaries, as described in the second and third sections of this ordinance, are hereby granted *to* the said New Orleans, Mobile, and Chattanooga Railroad Company, for its uses and purposes ; *provided,* that the said company shall inclose only such streets, or parts of streets, as shall be within the boundaries of the property which the said company shall acquire.    Sec. 4. *Be it further ordained,* That the mayor shall deliver the said bonds, from time to time, to the treasurer of said railroad company, as they may be required, upon his exhibiting to the said mayor the deeds or proper conveyances of said lands and premises, or so much of. said lands as said company may be able to acquire, within the boundaries hereinbefore enumerated, as are required therefor, not exceeding an aggregate of three hundred thousand dollars ; *provided,* however, that if the said company shall not locate and place upon said lands its machine-shops and depots, then the said company shall return to the mayor of said city of Mobile the three hundred bonds, or so many of said bonds as may have been received by said company.    Sec. 5. *Be it further or-*

[New Orleans, Mobile, and Chattanooga Railroad Co. v. Dunn.]

*dained*, That there is granted to the said New Orleans, Mobile, and Chattanooga Railroad Company the right of way through any of the intervening streets between Madison and Charleston streets, east of and including St. Emanuel street, necessary to lay thereon its rails, and run thereon its locomotives, cars, &c., with all necessary turnouts and switches; also, the right to lay a single track, with the necessary sidings and turnouts, from the northern boundary of its depot, as the same may be located, northerly through Commerce street to Beauregard street; thence northwardly, with tracks to connect with other roads, in such manner as said company may deem expedient and necessary for its business and interests. Sec. 6. *Be it further ordained*, That the said company shall permit the free use of the wharves on the river front, purchased and owned or acquired by said company, to all persons and business dealings with the said company, or in any manner appertaining to the affairs, business, or transactions of or with said company; and that the said company shall have full control and ownership of the same, subject only to such by-laws and ordinances as the city of Mobile may impose, for the government and regulation of wharves located in the city. Sec. 7. *Be it further ordained*, That this ordinance shall take effect from and after its passage."

This ordinance was amended before its passage, in three particulars, as follows: 1. By providing that the said railroad company "shall fill, clear, improve, and cause to be drained, all that part of Choctaw Point Tract acquired by said company, in the boundaries described in said ordinance, within two years from this date." 2. By inserting in lieu of the sixth section, the following: "*Be it further ordained*, That the said company shall permit the free use of the wharves on the river front, subject to such by-laws and ordinances as the city of Mobile may adopt from time to time for the government and regulation thereof." 3. By limiting the amount of the bonds to be issued to two hundred and twenty-five thousand dollars.

The bill alleged that the proposed issue of bonds under this ordinance was unconstitutional, illegal, and void; that it was a usurpation and unwarrantable assumption by the corporate authorities of the city of power which they did not possess; that its object and design was to tax the property and people of the city for the benefit of the railroad company; that it was a fraudulent device to appropriate the private property of the citizens to the use of a private corporation.

A decree *pro confesso* was entered against the railroad company. An answer was filed by the mayor and corporate authorities of the city, affirming the legality and validity of the ordinance. On final hearing, the chancellor granted the

relief prayed, and perpetually enjoined the issue of the bonds. From this decree the railroad company now appeals, and, after a summons and severance as to the other defendants below, assigns as error: 1st, the decree *pro confesso*; 2d, the final decree.

ALEX. MCKINSTRY, with whom was GEO. N. STEWART, for appellant. — 1. The railroad company and the city were authorized, by their respective charters, to make the contract contemplated by the ordinance. City Charter of 1866, §§ 1, 29, 30, 58, 59, 60, 85, 94, 100; Railroad Charter, Sess. Acts 1866–7, p. 403, §§ 2, 3, 7, 64, 38, 39, 42, 52, 56, 57; 3 Wallace, 654.

2. There is no constitutional inhibition. 24 Ala. 591; 17 Ala. 234; 9 Ala. 234; 36 Ala. 410; 39 Ala. 307; 8 How. U. S. 75; 3 Wallace, 654; 4 Wallace, 270; 1 Wallace, 220–72; 17 Wallace, 330.

3. That this power may be delegated to a municipal corporation, see cases above cited from Alabama Reports; also, 20 How. U. S. 135; 2 Black, U. S. 510; 1 Wallace, 202; 3 Wallace, 664; 4 Wallace, 210; 17 Wallace, 330. These authorities clearly show, not only that the contract is a proper one, but that it is eminently prudent and praiseworthy. In its objects, principles, and effects, the contract has become a familiar one in the courts, and is one of the most efficient elements in developing the material resources of the country. The aid furnished to railroads and canals by cities, counties, states, and even by the United States, is of daily occurrence and acknowledged validity. In addition to the cases already cited, see 7 Wallace, 82, 181, 392, 610, 619; 8 Wallace, 575, 481; 6 Wallace, 611, 619, 594; 5 Wallace, 705, 772, 194; 4 Wallace, 143, 210, 270, 435, 535, 598; 3 Wallace, 93, 275, 294, 327, 654; 2 Wallace, 10, 110, 283; 1 Wallace, 83, 175, 272, 291, 384; 2 Black, U. S. 418, 510, 590, 722; 1 Black, 39, 386; 2 Ala. 747; 45 Ala. 237, 406, 696.

4. The contract being valid and binding, it cannot be abrogated or repudiated by the city. 47 Ala. 652; 6 How. U. S. 507.

5. If there were any objection to the contract, the complainants cannot be heard to assert its invalidity. Private individuals cannot be allowed to enjoin the State, or any county or city, in its action by and through its official agents, in the discharge of their duties, or the exercise of their powers. To permit this to be done, would put it in the power of any disaffected or malicious citizen to stop the machinery of the government in all its ramifications. In relation to all public improvements, and the franchises connected therewith, the State

[New Orleans, Mobile, and Chattanooga Railroad Co. v. Dunn.]

is a necessary and indispensable party. 30 Ala. 66; 5 Wheaton, 291. Proceedings by *quo warranto*, under section 3079 of the Rev. Code, do not apply to municipal corporations. The bill should have been filed in the name of the State, by the attorney general. 2 Stew. 30; 5 Porter, 280; 16 Ala. 372; 18 Ala. 678; 19 Ala. 518; 22 Ala. 190; 24 Ala. 702; 30 Ala. 67; 9 Howard, 10; 43 Ala. 398; 14 Ala. 208.

R. H. & R. I. SMITH and P. HAMILTON, *contra.* —1. The ordinance contemplates, in effect, a scheme of public plunder, for the benefit of a private corporation; and this scheme is attempted to be hidden under the high-sounding phrases of the title and preamble, which resemble the recital of honest motives in fraudulent deeds, and are valueless as obligations or conditions. It is a pure gratuity, or donation to the railroad company, to enable it to acquire property for itself, at the expense of the taxpaying citizens, and without any compensation to them. It is a gross abuse and perversion of the taxing power. It does not fall within ordinary municipal action, for ordinary municipal purposes; and there is no grant of power, general or special, to which it can be referred. 36 Ala. 443; 31 Ala. 83, 542; 30 Ala. 461; 29 Ala. 651; 3 Wallace, 327; 1 Black, 408; 15 Wallace, 566.

2. If the city charter contained an express grant of power to issue bonds in such a case, and for such a purpose, it would be unconstitutional. The general assembly itself has no such power. Const. Ala. Art. I. §§ 25, 32, 33; Ib. Art. IV. § 33; Ib. Art. XIII. § 35; *Whiting* v. *Railroad Company*, Amer. Law Register, March, 1870, p. 156; *People* v. *Detroit Railroad Co.* Bench and Bar, July, 86; *Weeks* v. *Milwaukee*, 10 Wisconsin, 242; 39 Penn. 73; *Sharpless* v. *Mayor*, 21 Penn. 147, 188; *Penn. R. R. Co.* v. *Philadelphia*, 47 Penn. St. 189. Argument of Hon. Jno. A. Campbell in *Slaughter House Matter*, in 6th district court of Louisiana.

3. The point raised in this court, as to the parties, was not raised in the court below; and, for that reason, it cannot be entertained. *State Tonnage Cases*, 12 Wallace, 223. In England, the rule which required the intervention of the attorney general in certain cases, which was founded on a supposed interest the king had in the subject-matter of the suit, has been much relaxed, and would not include such a case as this. Kerr on Injunctions, 571, 573, §§ 3, 6; 1 Beavan, 594; 18 Vesey, 211; 16 Vesey, 340; 2 My. & Cr. 131; 12 Peters, 98. The English rule is not applicable to our republican institutions; and a long series of cases, in our own State and elsewhere, have sanctioned the practice pursued in this case. *Rosser* v. *Randolph*, 7 Porter, 238; *Mayor of Huntsville* v. *Rogers*, 10

Ala. 47; *Gibbons* v. *Gr. N. R. R. Co.* 36 Ala. 42; *Mayor, &c.* v. *Royal St. R. R. Co.* 45 Ala. 322; *Mayor, &c.* v. *Dargan,* 45 Ala. 311; *Lott* v. *Ross,* 38 Ala. 156; *Hinson* v. *Lott,* 40 Ala. 123; *Mayor* v. *Waring,* 41 Ala. 139; *State, ex rel.* v. *Mayor,* 24 Ala. 703; 5 Porter, 279; 10 Ala. 37; 4 Hawks, N. C. 390; 2 Story's Equity, §§ 920, 924; 18 Barbour, 248; Hilliard on Injunctions, 276, § 12; Ib. 315–18, §§ 16–21.

BRICKELL, J. — The right of property-holders, or taxable inhabitants, to the aid of a court of equity to prevent a municipal corporation and its officers from usurping powers, or violating duty imposed by law, whereby the burdens of taxation will be increased, is recognized by authority, and supported by principle. Municipal corporations are public corporations, and may not be so completely subjected to the jurisdiction of a court of equity as private corporations; yet, the powers with which they are clothed are to be exercised for the benefit of those residing within the territorial jurisdiction, and the officers exercising these powers may well be regarded as *quasi* trustees. A court may not intervene to prevent them from exercising, or to control the discretion with which they are of necessity intrusted, while within the line of their prescribed powers. It can and will interfere, to prevent them from exceeding these powers to the prejudice of the body corporate.

The point of controversy has not been as to the existence of the jurisdiction of a court of equity, but as to the proper party to invoke its exercise. Some authorities maintain, that it cannot be invoked by one or more tax-payers, unless the wrong complained of is attended with some special injury to them; that where the wrong is a violation of public duty, affecting alike all the inhabitants of a municipality, the aid of the court must be invoked by the attorney general, or other proper officer, in the name of the State. Otherwise, it is said, each taxable inhabitant could institute a suit, and the decree in the one suit would not bind the parties to the other; and thus a multiplicity of suits would be engendered and encouraged, and litigation indefinitely protracted. The irresistible weight of modern authority sustains the right of an individual tax-payer, suing in his own name, or on behalf of himself and others having a community of interest, who may make themselves parties complainant, to the aid of a court of equity, to prevent or avoid illegal corporate acts, whereby the burdens of taxation will be increased. In its practical operation, this principle has not resulted in the multiplicity of suits and the continuance of litigation, which was apprehended. The matter of dispute has been generally settled as finally, if not as conclusively, by one such suit, as it would have been by a suit

in the name of the State, at the instance of the attorney general. The remedy is simple, expeditious, and preventive of the abuse of corporate powers. The various authorities are collected and reviewed by Judge DILLON, in his excellent treatise on Municipal Corporations; and he approves the modern rule. Dillon on Mun. Corp. §§ 731–37. Though the question does not seem to have been directly passed upon, and expressly decided by this court, there are numerous decisions collected on the brief of the counsel for the appellee, in which the right of a tax-payer to maintain such suit has been so often recognized that we can scarcely regard the question as open. The complainants have pursued an appropriate remedy, and are entitled to the relief sought, if the corporate acts proposed are violations of duty, or usurpations of power by the corporate authorities.

2. The charter, or act of incorporation of the city of Mobile, does not materially vary from the charter of municipal corporations generally, either in the character or extent of the corporate powers conferred. The city is declared a corporation, under the name and style of the " mayor, aldermen, and common council of the city of Mobile," with the right of, and subject to suit by that name, and with capacity to take, hold, and dispose of property, real and personal. The territorial boundaries of the city are defined and prescribed. The powers of the mayor, aldermen, and common council are specifically enumerated. Among these are the powers to levy and collect taxes; to purchase, and provide for the payment of the purchase-money, such real and personal property, as may from time to time be deemed necessary and proper for the use, convenience, and improvement of the corporation; to construct gas-works, and water-works, for the purpose of furnishing light and water to the inhabitants of the city; to carry out the system of wharfage in the city, and to obtain control, by contract or purchase, of wharves and wharf property of the city, and, if necessary, *to issue city bonds, bearing interest, for purposes of the same ;* to pave the streets at public expense, or by assessments on the owners of property located on the streets; and general police powers. Acts of 1865–6, p. 202.

Corporations, public or private, are of legislative creation. Municipal corporations are strictly of political institution. Legislative sanction is indispensable to their existence, and over them legislative power is generally unrestrained. They have no other capacity or power than that which is expressly conferred, or which is necessary to carry into effect the purposes of their creation. In the work to which reference has been made it is stated: " It is a general and undisputed proposition of law, that a municipal corporation possesses and can exercise the

following powers, and no others : First, those granted in express words ; secondly, those necessarily or fairly implied in, or incident to the powers expressly granted ; third, those essential to the declared objects and purposes of the corporation, — not simply convenient, but indispensable.  Any fair, reasonable doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied." Dillon Mun. Corp. § 55.

The proposed corporate act of which complaint is made, and which the court is asked to prevent by injunction, is the issue by the mayor, aldermen, and common council, of negotiable interest-bearing bonds of the city of Mobile, to the New Orleans, Mobile, and Chattanooga Railroad Company. These bonds are either a gratuity, a donation to the railroad company, or founded on no other consideration than the benefits it is expected will accrue to the city from the location therein of the machine and workshops of the company ; the improvement of unoccupied real estate, and, in its improvement, the consequent drainage of a marsh or swamp, now noxious to the general health of the city.  If these bonds should be issued, and become debts chargeable on the city in its corporate capacity, the only source of payment is taxation.  The mayor, aldermen, and common council are clothed with the power of levying and collecting taxes on property, real and personal, and on various business pursuits and vocations within the city limits. The power of taxation thus conferred must be limited and confined strictly to the purposes for which the corporation is created.  The revenues derived from the exercise of this power must be faithfully applied to these purposes.  The corporate authorities cannot, without a violation of duty and a usurpation of power, appropriate the revenues thus produced to any other purposes or objects than such as are fairly expressed or reasonably implied in the charter.  It is not material what is the character of the object, or how pressing the necessity, or what are the benefits, real or imaginary, which may flow to the city ; if not within the purposes of the act of incorporation, there is a want of power in the corporate authorities.  Invasion or destruction by a public enemy may be impending, but the duty of repelling the one, and of averting the other, is not within the corporate power, or a duty resting on corporate authority ; and an appropriation of the corporate revenue to these purposes could not receive judicial sanction.  The erection of houses of worship might beautify and adorn the city, and improve and elevate the moral tone of the community, but their erection does not lie within the province of corporate power.  It may be that the location of the machine and workshops of this railroad company within the city would increase its business,

[New Orleans, Mobile, and Chattanooga Railroad Co. *v.* Dunn.]

introduce an industrious, enterprising element into its population, and afford employment to a number of its inhabitants more profitable than any they can now obtain ; but we do not find that the charter of the city contemplates the exercise of corporate power to accomplish these purposes, except as they may follow incidentally from the local government instituted by the charter from the protection and security it affords. If, therefore, the city bonds proposed to be issued are to be regarded as a donation or gratuity to the railroad company, to induce the location of its machine and workshops within the city limits, their issue is unwarranted, and should be restrained. Negotiable as they are proposed to be in form, if issued, the city might hereafter be embarrassed in defending against them when pressed as debts the city should pay. Though the defence would be complete, yet it would be embarrassing to the financial operations in which the corporate authorities may legitimately engage, if such a large amount of the bonds of the city were outstanding, apparently valid, and the invalidity of which could be pronounced only at the termination of litigation. We do not doubt that it is within the jurisdiction of a court of equity, and a duty, to restrain their issue.

The corporate authorities, doubtless, have power to construct the necessary sewers and drains within the city ; and it may be that the construction of the buildings the railroad company would erect for its shops, depots, &c., and the grading and filling up of the vacant ground on which they propose to locate them, would incidentally improve the drainage of the city, and promote its healthfulness. This, however, could be said of any other improvement of the same ground. Such drainage is a mere incident to the reclamation of the ground to private purposes ; its extent and character is dependent upon private will. The power of the city to construct sewers and drains is to be exercised for the public benefit, and is coextensive with public necessity. It involves not only the duty of construction, but the duty of continuance and keeping in repair. No such duty would rest on the railroad company. The sewers and drains the corporate authorities may construct remain under corporate control, as do the streets and alleys of the city. The drainage incidental to the improvements made by the railroad company is, like the improvements, a matter of private property and jurisdiction. The proposed issue of these bonds cannot be supported as an exercise of the corporate power over the sewerage and drainage of the city, though these may be improved by the uses to which it is proposed to induce the railroad company to appropriate vacant real estate within the city.

3. The proposed ordinance authorizes the issue of negotiable

bonds. These bonds are not to be issued in the exercise of any express corporate power, nor are they to be issued to enable the corporation to raise money to execute such power. In a single instance only is the corporation expressly authorized to issue interest-bearing bonds; and that is in the purchase of the wharves and wharf property of the city. The authority of municipal corporations to issue negotiable paper has been the subject of extended judicial discussion in this country, in recent years, and the decisions are far from being harmonious. Experience has proved that the exercise of such power has been fraught with evil to local communities, subjecting them to gross frauds, and entailing upon them heavy burdens, originating often in the corruption of their officers and agents, from which relief would have been certain, if it had not been for the form which the corporate obligation was made to bear. In the exercise of their express and incidental powers, these corporations may necessarily incur debts. Contracting a debt, and the making and delivery of negotiable paper as the evidence of such debt, seem to us distinct and independent, the one not necessarily including the other. At one time, though the capacity of an infant to bind himself for necessaries was as large as it now is, his negotiable promissory note was deemed void. The corporate contract, when it does not assume the form of negotiable paper, stands upon the same footing with the contracts of individuals. Whoever seeks its enforcement, takes the contract *cum onere* — with all its defects, and subject to all the defences which spring out of the transaction, and which could have been urged by the corporation against the party with whom it was originally made. If, in the exercise of the express corporate power to purchase real or personal property, a purchase is made on credit, and the corporate obligation, not negotiable in form, is issued for the purchase-money, a failure of the vendor's title, or a breach of his covenants of warranty, or a fraud practised by him, may form a full defence to the payment of such obligation, and justify the rescission of the contract of purchase, and the cancellation of the corporate obligation, without regard to who is the holder, or the consideration on which he acquired it. If the obligation is negotiable in form, and passes into the hand of a *bonâ fide* holder, the protection the law extends to commercial paper will cut off all such defences, and fasten upon the corporation a liability for which it has not received a corresponding benefit or consideration.

If we could reach the conclusion that the corporation had power to make the donation to the railroad company, or to give them the bounty which this ordinance proposes, we would feel constrained to declare that it could not be made to assume

[Davis v. City Council of Montgomery.]

the form and characteristics of negotiable bonds. A munici-
pal corporation, clothed with the express power of borrowing
money, or other similar power, may or may not take, as inci-
dental or implied, the capacity to issue negotiable paper. But
the corporation of the city of Mobile, in the exercise of no
power expressly conferred, takes such implied or incidental
power. Other means, better adapted to the execution of the
corporate powers, and less hurtful to the inhabitants of the city,
can be found for the consummation of all corporate purposes.
The evils attendant on the issue of negotiable corporate obli-
gations are so manifest, and have been so grievous, that they
form, in themselves, a sufficient reason for the adoption of this
principle, and it is supported by the highest judicial authority.
*Police Jury* v. *Britton*, 15 Wall. 566.

The decree is affirmed, at the costs of the appellant, the said
New Orleans, Mobile, and Chattanooga Railroad Company.